Filed 2/28/25  P. v. Diaz CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ELIAS DIAZ,<br><br>  Defendant and Appellant. | F086320<br><br>(Super. Ct. No. BF193010A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez and Jesica Y. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Following a bench trial, defendant Elias Diaz was found guilty of burglary (Pen. Code, § 460, subd. (a); count 1),[1] bribery (§ 67; count 2), and misdemeanor possession of drug paraphernalia (Health & Saf. Code, § 11364; count 3). At the sentencing hearing, the trial court imposed the upper term of six years on count 1, a concurrent upper term of four years on count 2, and 180 days on count 3 served concurrent to the sentence on count 1.

On appeal, defendant argues the bribery conviction is not supported by substantial evidence; defendant's trial counsel was constitutionally ineffective in failing to move to suppress statements defendant made after he invoked his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); and that the trial court failed to consider relevant mitigating circumstances in imposing the upper terms on counts 1 and 2.

We affirm. There is substantial evidence to support the bribery conviction, defendant has not established the requisite prejudice to support his ineffective assistance of counsel (IAC) claim, and defendant did not adequately preserve his sentencing claim for appeal.

**FACTUAL BACKGROUND**

Stemming from an incident where defendant forced his way into his neighbor's apartment and stole her purse, defendant was charged with burglary, bribery of an executive officer, and possession of drug paraphernalia. Defendant waived a jury trial, and a bench trial was held in April 2023.

***Prosecution Case***

On December 28, 2022, Officer Nathan Cantu was dispatched to an apartment building in Bakersfield to investigate a report of a resident's stolen property. At the apartment building, Cantu interviewed Marcia W., the victim whose belongings were

---

[1] All statutory references are to the Penal Code unless indicated otherwise.

2.

stolen. She told Cantu that defendant, her nextdoor neighbor in the apartment complex, had forced his way into her apartment with a screwdriver and stole her purse. She described that defendant had thrown an apple at her earlier in the day, and later burst into the apartment. Marcia asked him what he was doing, and then pushed at him when it appeared he was going to hit her. Defendant then said, "'Get out of my way, bitch,'" grabbed her purse from the bed and walked out the door. Cantu saw the door to Marcia's apartment appeared to have been damaged and forced open.

According to Marcia, defendant had been her nextdoor neighbor for almost two years in the low-income apartment building. They had exchanged keys to their respective apartments, and they had been friendly. Marcia testified at trial that defendant had been "joking around" with her before he took her purse. Marcia did not initiate a report to the police, but when she went to see the manager about 45 minutes after defendant left with her purse, she was told she had to report it, and the manager dialed 911 for her. The call was recorded and played at trial.

While Cantu was investigating Marcia's apartment, Cantu encountered defendant in the hallway nearby. Cantu conducted a patdown search of defendant and found a methamphetamine pipe, a screwdriver, two electronic benefits (EBT) cards and a credit card. The credit card and one EBT card had Marcia's name on them, and the other card had someone else's name on it.

Cantu testified that after he arrested defendant and placed him in the back seat of his patrol car, he administered the *Miranda* warning. Defendant invoked his rights, and Cantu turned off the microphone on his body camera. While Cantu's body camera microphone was muted, Cantu got into the front seat of his patrol car and defendant said to him, "'I just came into a lot of money, and if you let me go, I'll hook you up.'" Cantu unmuted his body camera, and tried to confirm what defendant had said. Cantu did not believe defendant was under the influence when speaking to him.

3.

### *Defense Case*

Defendant testified that he had lived next door to Marcia and was on good terms with her. He had permission to enter her apartment whenever she knocked on the wall that they shared. She had given defendant permission to use her EBT cards in the past, and he had never taken anything without her permission. He denied breaking into Marcia's apartment that day and taking her purse.

Defendant denied bribing Cantu during his arrest; he said he was "on drugs" at the time of his arrest, and was speaking "gibberish" to the officer. Defendant claimed he had only a few dollars at the time, and he had not cared if he was arrested. He admitted he had offered money to Cantu, but did so only out of generosity and due to being under the influence, not as a request for release.

### *Verdict and Sentencing*

The court found defendant guilty of all the charges, and found the burglary offense was a violent felony within the meaning of section 667.5, subdivision (c)(21). In May 2023, the court sentenced defendant to an aggregate term of six years. The court imposed various fines and fees and awarded 128 days of custody credit. The court also sentenced defendant on two trailing cases.

## DISCUSSION

### I.     Bribery

Defendant maintains there is no substantial evidence of bribery because defendant had not made any payment to the officer, and his statement to the effect that he would pay the officer money was not a promise, and did not show any serious intention to pay Cantu any particular amount of money in the future. According to defendant, the offer to pay the officer money, sandwiched around defendant's mumbling nonsense due to drug intoxication, was vague and referred to nothing of value; it was clear beyond doubt that the money defendant was talking about was either imaginary or not in defendant's possession and, thus, his offer of money could not constitute a legal promise. Defendant

4.

maintains that by including the word "'promise'" in the definition of a bribe under section 7, subdivision (b)(6), the "Legislature made it clear that a person must make a clear and definite commitment to pay in order for their words to qualify as a bribe." Because defendant's offer to pay money here did not constitute a clear and definite commitment to pay, defendant maintains there is no evidence that supports the bribery conviction.

The People argue defendant admitted he offered Cantu money, which is a thing of value. The only issue, according to the People, was whether that offer of money was made with the intent to influence Cantu into releasing him. The People maintain the prosecution was not required to prove that defendant actually had money—it was only necessary to show that defendant offered a bribe with the intent to influence.

## A.    Standard of Review

The applicable standard of review is well established. "The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *(People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury

could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt .…'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

To the extent we are called upon to interpret a statute or address other questions of law, our review is de novo with respect to those issues. (*People v. Brown* (2023) 14 Cal.5th 530, 536.)

### B.    Analysis

Pursuant to section 67, "Every person who gives or offers any bribe to any executive officer in this state, with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer, is punishable by imprisonment in the state prison for two, three or four years, and is disqualified from holding any office in this state."

In turn, section 7, subdivision (b)(6), defines "'Bribe'" as "anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in their action, vote, or opinion, in any public or official capacity."

Based on the definition provided in section 7, subdivision (b)(6), bribery is divided into two general categories. The first category involves actual direct payments— "'anything of value or advantage'" that is requested, given, or accepted with the intent to corruptly influence its target. (*People v. Moyer* (2023) 94 Cal.App.5th 999, 1012, quoting § 7, subd. (b)(6).) The second category involves promises—"'any promise or

6.

undertaking to give any[thing of value or advantage]' that is requested, given or accepted to corruptly influence its target." (*People v. Moyer, supra*, at p. 1012.)  Here, there is no evidence of any direct payment—the bribery conviction comes under the second category that involves promises.

The language of section 7, subdivision (b)(6), refers to "*any* promise or undertaking" to give a thing of value.  (Italics added.)  "As the Supreme Court has recognized, '[u]se of the term "any"' in a law 'demonstrates the Legislature intended the law to have a broad sweep.'"  (*People v. Moyer, supra*, 94 Cal.App.5th at p. 1012, quoting *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 714.)  Thus, "'any promise or undertaking to give [a thing of value]'" extends broadly to promises where the thing of value does not have a present and definite value; even a probable value or existence in the future is sufficient for liability to attach.  (*People v. Vincilione* (1911) 17 Cal.App. 513, 515 (*Vincilione*); see *People v. McGee* (1930) 107 Cal.App. 56, 58 (conc. opn. of Conrey, J.) (*McGee*).)

For example, in *Vincilione*, an attorney offered a justice of the peace an unspecified portion of the contingency fee he would receive as an attorney for the accused in a pending prosecution if the justice would dismiss the case.  (*Vincilione, supra*, 17 Cal.App. at pp. 514–515.)  The defendant argued the bribe related solely to a portion of the fee the defendant would receive, and thus did not purport to embrace an agreed and ascertained fee.  The defendant argued that what had been offered was not anything which had a real or potential existence and thus could not be said to have any present or prospective value.  (*Id.* at p. 515.)  The court rejected this argument, reasoning that "it is not necessary to a completion of the crime of offering to give a bribe that the thing offered as a bribe should have a present existence or a definite and ascertained value."  (*Ibid.*)  The court observed that while "an attorney's fee is oftentimes elusive and evanescent, it certainly has at all times a prospective value; and whether its future value be much or little[,] an offer to share it with a judicial officer in exchange for a favorable

7.

decision is sufficient to support an indictment for offering to give a bribe." (*Id.* at p. 516.)

In *McGee*, the defendant (McGee) represented himself to a police officer (Dutton) as an old friend of the husband of a defendant in a criminal action in which Dutton was a prospective witness. The question in that criminal case was whether McGee was intoxicated at the time of a car crash, and McGee suggested that Dutton might "'testify at the time of the trial that you don't know anything about the liquor.'" (*McGee, supra*, 107 Cal.App. at p. 58 (conc. opn. of Conrey, J.).) McGee told the officer that if he could "'do anything to fix this up, why, everything will be fixed up fine for you and you will be taken care of.'" (*Ibid.*) Relying on *Vincilione*, Justice Conrey explained this was sufficient to prove the offer of something of value or advantage as it was "'not necessary to a completion of the crime of offering to give a bribe that the thing offered as a bribe should have a present existence or a definite and ascertained value.'" (*McGee, supra*, at p. 58 (conc. opn. of Conrey, J., quoting *Vincilione, supra*, 17 Cal.App. at p. 515.)

Here, defendant did not need to have the money on his person for the offer of money to constitute a bribe. Nor did he have to specify any particular amount of money. (*McGee, supra*, 107 Cal.App. at p. 58 (conc. opn. of Conrey, J.).) It is also irrelevant whether the officer believed defendant could actually obtain any cash to support the offer. The reason the offer completes the offense of bribery, regardless of whether it is accepted or refused, is because it represents a "'sore temptation'" and it tends to corrupt. (*People v. Ah Fook* (1881) 62 Cal. 493, 495.) The imposition of liability cannot turn on whether the offer reasonably appeared certain or clearly ascertainable in value—otherwise, a promise of something of value would not constitute a bribe until a set and ascertainable value had been negotiated.

Defendant argues that by using the word "'promise'" in the definition of bribe in section 7, the Legislature "made it clear that a person must make a clear and definite commitment to pay in order for their words to qualify as a bribe." The purpose of the

laws against bribery, defendant argues, is to prevent the corrupt interference with the administration of justice. To have any persuasive effect at all, defendant argues, the promise must comprise a serious, definite, and believable offer to pay or undertake to provide something of value.

But *Vincilione* and *McGee* demonstrate the long-established interpretation that a promise within the contemplation of section 7 does not have to have *any* present existence. The contingency fee offered in *Vincilione* did not involve a set amount, and the attorney did not presently have the money. (*Vincilione, supra*, 17 Cal.App. at pp. 514–515.) In *McGee*, the promised thing of value was that "'everything will be fixed up fine'" and the officer would be "'taken care of.'" (*McGee, supra*, 107 Cal.App. at p. 58 (conc. opn. of Conrey, J.).) There was no evidence the person promising that "everything would be fixed up fine" was known to the officer, or that the officer was able to assess the promisor's ability to follow through on the promise.

Additionally, neither case involved any specific and existing amount of value for the offer to constitute bribery. Civil law contract principles relating to the definitiveness or specificity of a promise do not apply in this setting. And for good reason. If a promise of something of value must have a certain degree of specificity and definiteness before it can constitute a bribe, this would allow people to test whether an official was susceptible to bribery by making offers that are cryptically lacking details or definiteness, effectively creating corrupting temptations without any liability attaching. The same is true of offers that may not be especially appealing to the offeree—e.g., if the offeror appears unable to follow through on what was offered. The corrupting temptation still exists, and it opens the potential for negotiation to see if the offeror has something the offeree actually wants or believes will have future value. (See *People v. Ah Fook, supra*, 62 Cal. at p. 495 ["'The offer is a sore temptation to the weak or the depraved. It tends to corrupt, and as the law abhors the least tendency to corruption, it punishes the act which is calculated to debase, and which may effect prejudicially the morals of the community.'"].)

9.

Here, defendant admitted in his testimony that he offered the officer money, although he testified his intent was generosity rather than an offer in exchange for release. Cantu testified defendant had offered to "'hook [him] up'" with money specifically in exchange for release, which the trial court credited. That is substantial evidence of a promise of a thing of value given to corruptly influence Cantu to release him. (*People v. Jones* (2013) 57 Cal.4th 899, 963 ["'unless the testimony is physically impossible or inherently probable, testimony of a single witness is sufficient to support a conviction'"].)

## II. Effective Assistance of Counsel

Defendant notes that after Cantu gave the *Miranda* warning, he clearly invoked his rights to silence and to have an attorney present. After the invocation, defendant argues, Cantu continued to ask incriminating questions regarding his suspicion that defendant was trying to bribe him. Defendant maintains this was a clear violation of his Fifth Amendment rights. However, defendant's trial counsel never moved to suppress defendant's inculpatory statements elicited by Cantu's improper interrogation, and by failing to do so, rendered IAC.

The People maintain there were possible strategic reasons counsel may have had in declining to pursue a motion to suppress under the Fifth Amendment, including that the motion was futile. The People also assert defendant has failed to establish prejudice.

### A. Standard of Review

A defendant claiming IAC "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance .…" (*Id*. at p. 689; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption the challenged action might be considered sound trial strategy under the circumstances. (*Strickland, supra,* at p. 689; *Dennis, supra*, at p. 541.) "Reasonableness

10.

must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

Additionally, the defendant must also establish prejudice: "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of IAC] on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

## B. Additional Background

When defendant was arrested for burglary, Cantu placed defendant in the back seat of his patrol car, administered the *Miranda* warning, and defendant invoked.[2] Defendant kept talking, but Cantu told defendant he could not talk to defendant anymore because he had invoked, and Cantu closed the rear door of the patrol car. Cantu then muted his body camera, and eventually seated himself in the driver's seat of his patrol car. Cantu testified that after a few minutes, defendant made a spontaneous statement that he had just come into a lot of money, and if Cantu let him go, defendant would "'hook [him] up.'" Cantu then turned his microphone back on, and a second exchange was recorded:

> "Officer Cantu: … [¶] Wait, you what?
>
> "[Defendant]: I gotta lot of money (unintelligible) my, my room (unintelligible) all my information (unintelligible) tryin' to take over my identity. (unintelligible) my shit.

---

[2] The body camera video clearly shows defendant invoked. When this portion of the video was playing at trial, the trial court indicated it was "not going to consider his *Miranda* rights because he invoked them you told me. So skip over this." (Italics added.) No questions were asked of Cantu regarding defendant's invocation.

11.

"Officer Cantu:  And what are you tryin' to do with the money?

"[Defendant]:  (unintelligible) my money.  I came into a lot of money.

"Officer Cantu:  Oh, okay.

"[Defendant]:  I'll hook you up.

"Officer Cantu:  Hook me up with what?

"[Defendant]:  With money.

"Officer Cantu:  You're try-, are you offering me money?

"[Defendant]:  (unintelligible)

"Officer Cantu:  You're offering, you're offering an officer money?

"[Defendant]:  (unintelligible)

"Officer Cantu:  So you're tryin' to bribe me, which is a, which is a, w- w- which is a crime.

"[Defendant]:  (unintelligible) a lot of money (unintelligible).  She put me down as Jason, you know that's not my name.  She's tryin' to switch my account' (unintelligible).  (laughs).  (unintelligible)."[3]

On the same day as the trial, defense counsel filed motions in limine, including a one-sentence motion seeking a hearing pursuant to Evidence Code section 402 "to evaluate the admissibility of Defendant's statements."  There is a citation to *Miranda* immediately after the request, but no other detail or argument is provided.

Once defendant waived his right to a jury, the court and the parties proceeded with opening statements and the examination of witnesses—the record does not show the trial court ruled on any pretrial motions, or that the parties asked the court to do so.  Further, defense counsel did not raise objections under *Miranda* to admission of this portion of

---

**3**     We have reviewed People's exhibit No. 1, the body camera video of Officer Cantu, which matches what was transcribed in the written transcript of the video and offered as an aid at trial.

Cantu's body camera footage or his testimony regarding what defendant told him before he unmuted his camera while they were sitting in his patrol car.[4]

### C.    Analysis

The issue presented is whether defendant's trial counsel was ineffective for failing to pursue a motion to suppress—or otherwise object to the admission of—defendant's postinvocation statements to Cantu.

"A claim of [IAC] based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission [citation], but also that the motion or objection would have been meritorious, if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to [the] defendant would have resulted." (*People v. Mattson* (1990) 50 Cal.3d 826, 876; see *People v. Diaz* (1992) 3 Cal.4th 495, 562 [failure to object to admissible evidence does not constitute IAC because objection would have been futile].)

Given the circumstances presented, defendant has not established a motion to suppress defendant's postinvocation statements to Cantu would have been granted and, thus, defendant's IAC claim fails under *Strickland*'s prejudice prong. (*Strickland, supra*, 466 U.S. at p. 697 ["a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)

### 1.    Applicable Legal Principles

"'The Fifth Amendment provides, "No person … shall be compelled in any criminal case to be a witness against himself …." (U.S. Const., 5th Amend.) "To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the

---

[4]    The trial transcript reflects the trial court was not going to consider whether defendant invoked his *Miranda* rights because the parties agreed he had done so.

'inherently compelling pressures' of custodial interrogation (*Miranda, supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation."" (*People v. Hoyt* (2020) 8 Cal.5th 892, 930–931.) Interrogation "'under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response ...."" (*People v. Young* (2019) 7 Cal.5th 905, 923.)" (*People v. Wilson* (2024) 16 Cal.5th 874, 934 (*Wilson*).) "If a defendant has unambiguously invoked the right to remain silent, the interrogation must stop." (*Ibid.*, citing *People v. Krebs* (2019) 8 Cal.5th 265, 313.)

Similarly, "'when an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."'" (*People v. Johnson* (2022) 12 Cal.5th 544, 577–578, quoting *Arizona v. Mauro* (1987) 481 U.S. 520, 525–526; accord, *Edwards v. Arizona* (1981) 451 U.S. 477, 484 ["when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights" (fn. omitted)].) "In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.) Thus, "it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures'

14.

and not the purely voluntary choice of the suspect." (*Arizona v. Roberson* (1988) 486 U.S. 675, 681.)

Nevertheless, "[w]hen a suspect freely decides to reinitiate communication, the law does not foreclose the admission of subsequent statements .…" (*Wilson, supra*, 16 Cal.5th at p. 936, citing *People v. Krebs, supra*, 8 Cal.5th at p. 315.) "An accused 'initiates' [further communication] when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.'" (*People v. Mickey* (1991) 54 Cal.3d 612, 648, quoting *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045; accord, *People v. Molano* (2019) 7 Cal.5th 620, 656.)

### 2. Defendant's Audible and Inculpatory Postinvocation Statements Were Admissible

There is no dispute defendant invoked his rights under *Miranda* when Cantu advised him of those rights. In finding defendant guilty of bribery, the trial court credited Cantu's testimony about what defendant said to him when Cantu's microphone was muted. Cantu testified defendant spontaneously said he had come into money and would "'hook [Cantu] up'" if he let defendant go. Thus, the record reflects that after defendant invoked his rights, it was defendant who made a voluntary statement without any prompting or compulsion, rendering it admissible. (*Miranda, supra*, 384 U.S. at p. 478 ["Any statement given freely and voluntarily without any compelling influences is, of course, admissible into evidence."].) As explained by the court in *United States v. Carpenter* (5th Cir. 1980) 611 F.2d 113, there are frequently situations "in which a defendant invokes his *Miranda* rights and then, without further accusatory statements or questioning by the authorities, initiates a statement which turns out to be incriminating. Such spontaneous, unprovoked statements do not violate the principles of *Miranda*, simply because the requisite element of Government 'interrogation' is lacking." (*Id.* at p. 117; accord, *United States v. Laughlin* (7th Cir. 1985) 772 F.2d 1382, 1386 [initial

15.

spontaneous statement after invoking *Miranda* rights was not in response to custodial interrogation and did not violate 5th Amend.]; see *People v. Mickey, supra*, 54 Cal.3d at p. 648 [spontaneous statements are not the product of interrogation and therefore are not violative of *Miranda*].)

Defendant's reliance on *People v. Henderson* (2020) 9 Cal.5th 1013 is unpersuasive. There, after initially waiving his *Miranda* rights, the defendant invoked his right to counsel during interrogation. (*Henderson, supra*, at p. 1020.) The officers questioning the defendant did not acknowledge his invocation and instead continued to question him, and the defendant eventually admitted to committing the crimes. (*Id.* at pp. 1020–1021.) Our high court concluded the officers were required to stop the interrogation upon the defendant's invocation, but failed to do so; thus, the defendant's subsequent statements were inadmissible as substantive evidence at trial. (*Id.* at p. 1029.) The court reasoned the defendant "clearly said he wanted to talk to a lawyer" (*id.* at p. 1023), and his request for counsel was "unequivocal" (*id.* at p. 1025). Here, unlike the officers in *Henderson*, Cantu stopped talking with defendant when he invoked, and it was *defendant* who later volunteered, without any prompting or questioning, to give Cantu money if he would release defendant. (See *Lukehart v. Secretary, Florida Department of Corrections* (11th Cir. 2022) 50 F.4th 32, 44 ["Voluntary and spontaneous statements made by a suspect are admissible in evidence whether or not the suspect has previously requested an attorney, as long as the statements are not made in response to questioning by the police."].)

Moreover, the limited follow-up questions Cantu asked to this volunteered statement did not constitute interrogation. In *Rhode Island v. Innis* (1980) 446 U.S. 291, the high court defined the term "interrogation," stating that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police

16.

(other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Id*. at pp. 300–302, fns. omitted.)

As reflected *ante*, in response to defendant's initial spontaneous statement, Cantu first asked, "Wait, you what?" That question merely sought to clarify what defendant had spontaneously volunteered. When defendant began to talk about the money he had, Cantu asked, "And, what are you tryin' to do with the money?" When defendant responded he had come into a lot of money, Cantu merely commented, "Oh, okay." That might have been the end of the whole exchange, but then, without a question pending, defendant said, "I'll hook you up." Cantu then asked, "Hook me up with what?" Defendant then responded, "With money." Cantu's follow-up questions appear designed to ascertain and clarify exactly what defendant was trying to tell him about the money, rather than questions Cantu should have known were going to elicit an incriminating response. (See *People v. Gamache* (2010) 48 Cal.4th 347, 388 [pre-*Miranda* warning questions by booking deputy following up on the defendant's volunteered statement were ""neutral inquir[ies]"" [that] did not convert [the defendant]'s volunteered admissions into the product of interrogation"]; see also *United States v. Chipps* (8th Cir. 2005) 410

17.

F.3d 438, 445 ["A request for clarification of a spontaneous statement generally does not constitute interrogation."].)

Finally, even if Cantu's final questions about whether defendant was tying to offer him money constituted interrogation because they were accusatory and defendant had already clarified he was offering Cantu money, which Cantu understood by then, defendant gave no audible answer that we can discern from the video, and the only audible portion in response to Cantu's final statement that defendant was trying to bribe him indicated nothing inculpatory or relevant.[5]  Suppressing those inaudible or irrelevant answers would have been futile.

In sum, defendant cannot establish the motion to suppress would have been granted with respect to defendant's relevant and audible postinvocation statements.  As a result, defendant cannot make the requisite showing there was a reasonable probability, but for defense counsel's failure to move to suppress those statements, the result of the proceeding would have been different.  (*People v. Mattson, supra*, 50 Cal.3d at p. 876; *Strickland, supra*, 466 U.S. at p. 696.)

## III.    Imposition of Upper Terms on Counts 1 and 2

Defendant argues the trial court failed to consider relevant mitigating circumstances when it imposed upper term sentences on counts 1 and 2.

### A.    Standard of Review

"We review discretionary sentencing decisions for abuse of discretion."  (*People v. Knowles* (2024) 105 Cal.App.5th 757, 764–765 (*Knowles*), citing *People v. Sandoval* (2007) 41 Cal.4th 825, 847, abrogated on a different ground in *People v. Lynch* (2024) 16 Cal.5th 730, 759.)  "A court abuses its sentencing discretion when it acts arbitrarily and capriciously, relies on improper matter in reaching its decision, or is unaware of the scope

---

[5]    Although the transcript is not evidence, the transcriptionist also did not report any audible and relevant content in response to those last two questions.

of its discretion so that it does not exercise informed discretion at all." (*Knowles, supra,* at p. 765, citing *People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)

"We presume that the trial court acted to achieve legitimate sentencing objectives. [Citation.] The burden is on the party challenging the sentencing decision to show that the court abused its discretion. [Citation.] We may not presume error from a silent record. [Citation.] 'Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant factors set forth in the rules.'" (*Knowles, supra*, 105 Cal.App.5th at p. 765, quoting *People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322 & citing Cal. Rules of Court, rule 4.409.)

## B.    Additional Background

At the sentencing hearing, the court commented on the bribery conviction as follows:

> "I have read and considered the probation officer's report. I will tell you that my initial reaction, even though he was found guilty of [section] 67, I would make that a misdemeanor. I don't think it was that egregious. However, it does not appear to me to be a wobbler. In fact, the only punishment is state prison on that one. So I'm open to suggestions or ideas. I think technically he was guilty of that, but I don't know that it deserves to be a felony, but I don't know that I can do anything of it other than keep it as a felony. All right."

The court went on to explain that, in looking at the sentencing report, the court planned "on running [the bribery conviction] concurrent because as I said, I don't believe it's that serious of what he did. I have been around the justice system for 35 plus years or thereabouts and defendants say these things to cops. I don't know if it's worth a felony, but I can't make it a misdemeanor because it's a non-wobbler, but I can certainly run the time concurrent."

The court then identified one circumstance in mitigation, which was defendant's prior performance on juvenile probation, that was satisfactory. The court found the following circumstances in aggravation:  (1) prior convictions as an adult or sustained

petitions in juvenile delinquency proceedings are numerous; (2) he was armed with or used a weapon at the time of the crime; (3) the victim was particularly vulnerable in that she was elderly; (4) defendant has engaged in violent conduct that indicates a serious danger to society based on the circumstances of this offense and his criminal history; defendant had served prior prison terms; (5) he was on mandatory supervision when the crime was committed; and (6) his performance on misdemeanor and felony probation, mandatory supervision, postrelease supervision, and parole was unsatisfactory because he violated or reoffended. The court observed, "I don't think I have any choice but to give him the upper term. The factors in aggravation clearly outweigh those in mitigation."

The trial court imposed the upper term of six years for burglary and a concurrent upper term of four years for bribery.

### C.    Analysis

"'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons .…"'" (*People v. Scott* (2015) 61 Cal.4th 363, 406.) "Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] '"""The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."""'" (*People v. Stowell* (2003)

31 Cal.4th 1107, 1114; accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.)

"'[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, fn. 7.) Absent a change in the law that applies retroactively (e.g., *People v. Stamps* (2020) 9 Cal.5th 685, 698–699), or an extenuating circumstance such as futility (e.g., *People v. Perez* (2020) 9 Cal.5th 1, 7–8), neither of which is applicable here, the policy reasons underlying the forfeiture doctrine fully support its application where a defendant remains silent in the trial court when sentenced and then seeks to obtain appellate relief based on asserted sentencing errors.

Defendant argues the trial court abused its discretion by failing to take into account two mitigating factors: that defendant's current offenses were connected to his mental illness (§ 1385, subd. (c)(2)(D), and the minimal threat of violence that the crimes involved. But defense counsel voiced no objection at the sentencing hearing, or indicated these were mitigating circumstances the trial court should consider. The lack of objection at the sentencing hearing forfeited this claim on appeal.

Defendant also maintains the trial court was apparently unaware of the scope of its discretion under section 1170 when it stated, "I don't think I have any choice but to give him the upper term." The forfeiture rule does not apply where a defendant challenges a sentencing court's "apparent misapprehension of statutory sentencing obligations." (*People v. Panozo, supra*, 59 Cal.App.5th at p. 840.) Viewed in context, however, the trial court's statement was a comment that the aggravating circumstances relevant to count 2 so far outweighed the one mitigating circumstance found, the court felt it was unreasonable to conclude anything less than the upper term was warranted. It does not reflect the trial court misunderstood section 1170, subdivision (b), to mean, for example, that the mere presence of, or a certain number of, aggravating circumstances *required* imposition of the upper term. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390

["Absent evidence to the contrary, we presume the trial court knew and applied the governing law."].)  When viewed in context, this statement is not sufficient to show the trial court misunderstood the scope of its sentencing discretion in imposing the upper term.

## DISPOSITION

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.